## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**EUGENE DICKINSON,**

      **Plaintiff,**

                           **Civil Action 2:19-cv-3670**
    **v.**                      **Judge James L. Graham**
                           **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Eugene Dickinson, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply (ECF No. 16), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed his applications for disability insurance benefits and for supplemental security income in December 2013, alleging that he has been disabled since November 6, 2013, due to an

1

unexpected massive heart attack, diabetes mellitus, type 2, a blood clot in his leg, acute

respiratory failure, cardiogenic shock, metabolic acidosis, renal failure (ARF), and STEMI (ST-

elevation myocardial infarction). (R. at 224-31, 250.) Plaintiff's applications were denied

throughout the administrative process, which included a denial by the Appeals Council. Plaintiff

filed a Complaint in the United States District Court for the Southern District of Ohio. Upon the

parties' joint motion, the Court remanded the case back to the administrative level by Order

dated March 22, 2018. (*See Dickinson v. Commissioner of Social Security*, Case No. 2:17-cv-

00957, ECF No. 10.)

Upon remand by the Appeals Council (R. at 1204-08), Administrative Law Judge Jeffrey

Hartranft ("ALJ") held a subsequent hearing on March 13, 2019, at which Plaintiff, represented

by counsel, appeared and testified. (R. at 1173-1202.) On April 24, 2019, the ALJ issued a

decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(R. at 1134-60.) Plaintiff appealed directly to this Court. This matter is properly before this

Court for review.

## II. HEARING TESTIMONY

Plaintiff testified at the administrative hearing on March 13, 2019, that his problems

include fatigue and "mainly it's my foot." (R. at 1182.) Plaintiff reported that his foot started

dying and he had a prior hole in the heel going through to the bone. (*Id.*) He stated "it just scabs

overs…. Like a heal spur." (*Id.*) Plaintiff explained that his fatigue makes him "crazy." (R. at

1183.) He stated that his thoughts are everywhere. He is unable to focus on one thing and feels

like his mind is "always thinking." (*Id.*) He also noted that he can't get along with people. (*Id.*)

Plaintiff testified that the month prior to his hearing his mother died and he had yet to cry. (R. at 1183.) He noted that he is unable to grieve, he has no support or love. (*Id.*) Plaintiff reported that he is probably going to have to see a counselor, because his wife is tired of him and his child hates him. (R. at 1184.) Plaintiff stated that, "sometimes I really do feel like I would be better off dead." (*Id.*) At the time of the hearing, Plaintiff was taking two medications for stress, but he did not think the medicine helped. (*Id.*)

Plaintiff reported that he liked working and doing physical work but that he is unable to do any of those things any longer due to his foot pain. (R. at 1185.) He stated he does not take pain pills and can only wear slippers. (R. at 1186.) Plaintiff stated he is unable to walk with his wife and sleeps all of the time. (R. at 1187.)

In response to questions from his attorney, Plaintiff testified that when he is up, he hates being on his foot. (R. at 1188.) He explained that he generally sits down and keeps his foot elevated. (R. at 1189.) Plaintiff stated that, at the time of the hearing, he probably elevated his foot more than four hours. (*Id.*) Plaintiff reported he has issues with balance and has fallen "on my face." (R. at 1190.) Plaintiff testified that his insurance will not pay for a cane and he does not have any money. (*Id.*) Plaintiff reported that he takes "9 pills of Tylenol" for pain, but that it is "eating up my stomach." (R. at 1190-91.) He stated that he is unable to stand in one place due to pain. (R. at 1191.)

Plaintiff also testified to experiencing shortness of breath and chest pain, "just trying to do the man duties, take the trash out." (R. at 1191.) Plaintiff reported that he has anxiety medication, but he still has anxiety attacks. (R. at 1192-93.)

3

Plaintiff testified at his prior administrative hearing on June 1, 2016, that he was married, with a 9-year old daughter living with him.  (R. at 49.)  He no longer had a driver's license, explaining his license was taken away after a DUI and he never had it reinstated.  (R. at 50.)  Plaintiff testified he stopped working when he had a heart attack.  (R. at 51.)  He feels he cannot work due to his feet "constantly hurting."  (R. at 57.)  He did not want to take OxyContin and was trying to the "man thing."  (*Id.*)  He had back pain and his eyes bother him, reporting blurry vision.  (R. at 58.)  Plaintiff also acknowledged experiencing some memory issues, reporting he had been slower since his stroke.  (R. at 58-59.)  Plaintiff testified that he worked until he had the heart attack.  (R. at 59.)  He reported foot pain, noting that he wears orthopedic shoes and toe points.  (R. at 60.)  He stated that he had a difficult time walking and reported having two of his toes removed.  (*Id.*)  Plaintiff reported that he elevated his legs so they do not swell, approximately 6-7 times a day for a total of approximately 4 hours during the day.  (R. at 65-66.)

Plaintiff estimated that he could not stand for an hour, but could maybe stand for a half hour before needing to sit as a result of his foot pain.  (R. at 61.)  He estimated he could walk "maybe" 15 minutes and "not far."  (*Id.*)  Plaintiff testified that both his feet and his heart prevent him from walking far.  (R. at 61-62.)  Plaintiff also testified that he had difficulty sitting longer than 15 minutes because of his back pain.  (R. at 62.)

Plaintiff testified that he helped with household chores, but explained that it took him longer than normal to finish his tasks and takes breaks between chores.  (R. at 64, 66-67.)  Plaintiff has medications for his chest pain, but had only used it on one occasion.  (R. at 68.)

### III.     RELEVANT MEDICAL RECORDS AND OPINION

#### A.     Dr. Nihad Al-Assaad, M.D.

Plaintiff began treating with cardiologist, Dr. Al-Assaad in November 2013 after he was admitted through the emergency room at Good Samaritan Hospital for chest pain.  (R. at 575.) While at Good Samaritan Hospital, Plaintiff had an x-ray of the chest, which showed airspace opacities which were found to "probably represent asymmetric pulmonary edema."  (R. at 427.) A CT of the lower extremity showed edema and heterogeneity to the right calf muscles.  There was no significant occlusive change in the vessels of the left lower extremity.  (R. at 400.)

When Plaintiff was seen for follow up in February 2014, Dr. Al-Assaad noted Plaintiff's history of severe coronary artery disease, extensive anterior wall myocardial infarction status post percutaneous coronary intervention (PCI) with drug-eluting stent in the left anterior descending with severe left ventricular systolic dysfunction complicated by paroxysmal atrial fibrillation, diabetes, peripheral arterial disease.  (R. at 624.)  He further noted that Plaintiff had been on medical therapy for severe left ventricular dysfunction; had a life vest to prevent sudden cardiac death since his myocardial infarction; and had recently had an echocardiogram to assess his left ventricular function.  (*Id.*)  Plaintiff's life vest had not gone off a single time and he was "feeling better." (*Id.*)   However, Dr. Al-Assaad noted Plaintiff's ejection fraction was still in bilateral echocardiogram between 30% and 35% with extensive anterior wall hypokinesis and abnormal diastolic function. (*Id.*)   At that time, Plaintiff denied any chest pain, shortness of breath, palpitations, dyspnea on exertion, orthopnea, paroxysmal nocturnal dyspnea, presyncope,

syncope, lightheadedness, dizziness, nausea or vomiting.  (*Id.*)  Plaintiff was to continue with his life vest and medications.  (R. at 624-25.)

Plaintiff was seen for a similar follow-up visit on April 2, 2014.  (R. at 729-732.)  In July 2014, Dr. Al-Assaad completed a cardiac functional capacity questionnaire in which he reported that Plaintiff had extensive anteroseptal myocardial infarct treated with PCI; severe coronary artery disease; severe left ventricular dysfunction; and ischemic cardiomyopathy with symptoms of anginal equivalent pain, shortness of breath, weakness, and edema.  (R. at 683.)  Dr. Al-Assaad opined that Plaintiff was incapable of performing even "low stress" jobs. (R. at 684.)  Plaintiff's cardiac impairments were not expected to last for twelve months.  (*Id.*) He also opined that Plaintiff would need to take unscheduled breaks; he would need to elevate his legs frequently at a height of 30 to 60 degrees; and he would experience "good" and "bad" days. (R. at 685.)  Dr. Al-Assaad noted that Plaintiff "would be unable to work." (*Id.*).  Progress notes from January 7, 2015 through September 3, 2015 reflect, *inter alia*, no edema in Plaintiff's extremities.  (R. at 869-900.)

### B.    Steven Meyer, Ph.D.

Dr. Meyer evaluated Plaintiff on February 26, 2014, for disability purposes.  (R. at 578-83.)  Plaintiff applied for benefits due to his physical conditions.  (R. at 578.)  He denied ever being hospitalized for mental health conditions and denied experiencing problems getting along with others or authority figures.  (R. at 579.)  Plaintiff reported that he was involved in counseling a long time ago, but had never undergone formal psychological testing.  (*Id.*)  He has never experienced a nervous breakdown or attempted suicide.  (*Id.*)  On mental status

examination, Plaintiff was found to be adequately groomed and cooperative, showing no impulsive behaviors and good eye contact. (R. at 580.) His expressions were normal and he spoke in a normal tone of voice. (*Id*.) His thought processes were well organized and showed no flight of ideas, his affect was constricted, and his mood was assessed as anxious and dysphoric. (*Id*.) When asked how he was feeling emotionally, Plaintiff reported he was sad. (*Id*.) He had difficulty sleeping due to his pain. (*Id*.) He denied experiencing crying spells. (*Id*.) He had been depressed since his heart attack, due to his loss of functioning. (*Id*.) Plaintiff noted he isolates from others and has some recurrent thoughts that he could die. (*Id*.) Plaintiff also reported nervousness. (*Id*.) He denied panic attacks, but reported low energy, frustration, fear of heights and small places, worry, and noted he was easily angered. (*Id*.) Dr. Meyer found Plaintiff's short-term memory was poor, but his long-term memory was average. (R. at 581.) He exhibited poor concentration, but was able to understand simple instructions. (*Id*.) He was observed to work at an average pace overall. (*Id*.)

Dr. Meyer diagnosed Plaintiff with Adjustment Disorder with Depression and Anxiety. Dr. Meyer assigned Plaintiff a GAF score of 57. (R. at 581.) Dr. Meyer opined that Plaintiff has the cognitive capacity to understand, remember, and carryout simple and some moderately complex instructions and tasks, with oral and hands-on assistance, as needed. (R. at 582.) He is expected to be able to perform only in a setting without strict production requirements, for work within any physical conditions, and with considerable assistance at times of learning and performing new tasks. (*Id*.) Plaintiff is expected to be able to interact appropriately with a work setting that has low social requirements, with occasional contact with coworkers and supervisors.

(*Id*.)  Plaintiff is able to perform in a low stress work setting, for work within any physical conditions and with assistance available at times if change in routine.  (*Id.*)

### C.      Maria Kataki, M.D., Ph.D.

Plaintiff consulted initially with neurologist, Dr. Maria Kataki on March 18, 2016 due to concerns of memory loss.  (R. at 1013.)  Plaintiff reported difficulty with reading and writing, performing household tasks, grasping situations or explanations, and recalling recent events.  (R. at 1013-14.)  Dr. Kataki reported that Plaintiff had scored 26/30 on a Mini Mental Status Equivalent Examination and scored a 7/22 on the SAGE (Self-Administered Gerocognitive Exam) evaluation.  (R. at 1018.)  Dr. Kataki noted he was impaired in his visual spatial skills, orientation to time, calculation abilities, executive function and delayed recall   (R.at 1019.)  Dr. Kataki also noted that Plaintiff was unable to perform serial sevens.  (R. at 1018.)  Physically, Dr. Kataki observed abnormal gait and postural instability.  (*Id*.)  Plaintiff's neurological examination was significant for right spastic gait, right facial asymmetry, right lateral foot sensory.  (*Id*.)  Dr. Kataki assessed memory loss, left cerebrovascular accident (CVA), history of myocardial infarction (MI), gait disturbance, dysesthesias, and impaired vibration proprioception to toes.  (R. at 1019.)

At a follow-up evaluation on April 1, 2016, Dr. Kataki noted that the findings were consistent with significant cognitive impairment that meets the criteria for a Dementia syndrome at the mild level of severity.  (R. at 1024.)  At a follow-up appointment on April 29, 2016, Dr. Kataki opined that Plaintiff's freeway driving, driving in unfamiliar places, and nighttime driving should be restricted.  (R. at 1883.)  She further recommended that a family member who was an

experienced driver should supervise Plaintiff's driving once a month to ensure no safety concerns.  (*Id.*)  If safety concerns developed, Dr. Kataki advised that Plaintiff restrict his driving or take the state driving evaluation.  (*Id.*)

### D.    State Agency Review

State agency psychologist, Karla Voyten, Ph.D. reviewed Plaintiff's file in March 2014 and found that Plaintiff had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence and pace.  (R. at 89.)  Dr. Voyten found that Plaintiff's statements were fully credible, noting overall consistency.  (R. at 90.)  Dr. Voyten concluded that Plaintiff could perform simple, one to two-step tasks; attend to tasks in an environment that did not contain frequent interruptions and did not require prioritizing of tasks; and interact with co-workers and supervisors on a superficial level.  (R. at 94.)  She further stated that Plaintiff's contact with the general public should be kept to a limited basis and that he should be limited to jobs where the changes can be introduced gradually, and can be explained, as well as requiring direction as to what is expected.  (R. at 92-94.)  State agency psychologist, Cynthia Waggoner, Psy.D., reviewed the file at the reconsideration level in September 2014 and affirmed Dr. Voyten's assessment.  (R. at 127-34.)

### IV.    ADMINISTRATIVE DECISION

On April 24, 2019, the ALJ issued his decision.  (R. at 1134-60.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016.

(R. at 1137.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since November 6, 2013, the alleged onset date. (*Id.*) The ALJ found that Plaintiff had the following severe impairments: myocardial infarction; atrial fibrillation; ischemic cardiomyopathy; left ventricular dysfunction; atherosclerosis of the native arteries of the extremities with gangrene; diabetes; amputation of the first and second toes of the right foot; plantar fibromatosis; contraction of the right Achilles tendon with surgical repair; an adjustment disorder with depression and anxiety; and vascular dementia. (*Id.*)

The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1139.) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

10

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could stand/walk 4 hours during an 8-hour workday.  He could occasionally operate foot controls and occasionally climb ramps and stairs, but could never, climb ladders, ropes, and scaffolds.  The claimant could occasionally balance, stoop, kneel, crouch, and crawl.  He should avoid exposure to extreme heat and cold.  The claimant should avoid workplace hazards such as unprotected heights and machinery.  The claimant could perform simple, routine, repetitive tasks, involving only simple work-related decisions, and few if any workplace changes.  The claimant could not perform strict production quotas or fast-paced work, such as on an assembly line.  He could have occasional interaction with the general public, coworkers, and supervisors.  He could not perform tandem tasks or customer service responsibilities. Instructions should be given either orally or by demonstration.

(R. at 1141.)

In making the above determination, the ALJ afforded some weight to the opinion of Dr. Al-Assaad, Plaintiff's treating cardiologist.  First, the ALJ noted that Dr. Al-Assaad believed that Plaintiff's condition would not be expected to last 12 months, but the ALJ determined that the combination of Plaintiff's cardiac conditions and associated symptoms have lasted more than twelve months and found the impairment "severe."  The ALJ also concluded that Dr. Al-Assaad's opinion that Plaintiff had "marked" physical limitations that would preclude even low stress jobs was an issue reserved to the Commissioner.  (R. at 1154.)

As to Plaintiff's need to elevate his legs, the ALJ found:

> []… concerning leg elevation and being unable to participate in even low stress work are inconsistent with the record as a whole.  The claimant has been able to sit, stand, and walk and no other treating or examining medical provider has supported a need for leg elevation.  The claimant has reported needing an ambulatory aid; however, in May 2015, the record notes there was no weakness or impairment to his gait and the gait was noted to be steady (Exhibit 17F/72).  The claimant was noted to be ambulating without help and was not noted to be using any assistive device, even after a contracture surgery of the Achilles tendon (Exhibit 17F/73).  Despite the physician's noted limitations, he provides for no use of an ambulatory

11

> aid or assistive device. Additionally, in terms of the limits on elevating one's legs, while he testified to edema, the record does not support lower extremity edema. In fact, the record shows no chest pain, palpitations, orthopnea, or edema (Exhibit 19F/21). The most recent evidence of record supported stable cardiomediastinal silhouette (Exhibit 32F/59). Further, the claimant himself admitted that he was working on a roof with his friend on more than one occasion and was working on metal gutters in 2018.

(R. at 1154.)

The ALJ assigned some weight to the assessments from the state agency reviewing psychologists, Drs. Voyten and Waggoner, but did not adopt their opinions verbatim, finding the assessed limitations in each area of functioning generally persuasive.  The ALJ also determined that the evidence supports additional mental limitations, particularly in understanding/ remembering/applying information, social functioning, and adaptation, due to Plaintiff's combination of reported moodiness and memory loss.  (R. at 1157.)

Turning to Dr. Meyer, the ALJ found his opinion overall persuasive and afforded it significant, but not adoptive or determinative weight.  (R. at 1157-58.)

Relying on the VE's testimony, the ALJ found that Plaintiff's limitations precluded his ability to perform his past relevant work as an injection mold machine tender, packer, material handler, or a commercial cleaner.  (R. at 1158.)  The ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy.  (R. at 1159-60.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since November 6, 2013 the alleged onset date.  (R. at 1160.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

13

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff puts forth two contentions of error: (1) The ALJ's RFC determination is not supported by substantial evidence; and (2) the ALJ erred in failing to address all the medical opinions of record.  (EFC No. 10).  The Court will address each contention in turn.

### A.    The ALJ's RFC Determination

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence for two reasons.  First, Plaintiff argues that the ALJ failed to include a limitation for his need to elevate his legs on a frequent basis.  Further, Plaintiff asserts that the ALJ failed to properly evaluate his mental health limitations.   The Court disagrees.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at

*10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, the ALJ set forth Plaintiff's RFC as follows:

> … [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [plaintiff] could stand/walk 4 hours during an 8-hour workday. He could occasionally operate foot controls and occasionally climb ramps and stairs, but could never, climb ladders, ropes, and scaffolds. The [plaintiff] could occasionally balance, stoop, kneel, crouch, and crawl. He should avoid exposure to extreme heat and cold. The [plaintiff] should avoid workplace hazards such as unprotected heights and machinery. The [plaintiff] could perform simple, routine, repetitive tasks, involving only simple work-related decisions, and few if any workplace changes. The [plaintiff] could not perform strict production quotas or fast-paced work, such as on an assembly line. He could have occasional interaction with the general public, coworkers, and supervisors. He could not perform tandem tasks or customer service responsibilities. Instructions should be given either orally or by demonstration.

(R. at 1141.)

### 1. **Leg Elevation**

Plaintiff contends that Dr. Al-Assaad's medical opinion specifically indicated that he must elevate his legs during any portion of an eight-hour workday to alleviate edema symptoms. Further, Plaintiff asserts that his own testimony supports his need to elevate his legs for most of the day to prevent pain and swelling. For these reasons, Plaintiff argues that the ALJ erred by failing to include a limitation as to leg elevation in the RFC determination. Further, Plaintiff maintains that this error was not harmless because, based on the VE's testimony, this limitation would have been determinative of disability.

The ALJ considered Dr. Al-Assaad's opinion and found that it was entitled to some weight, finding that the record did not objectively support the severity and intensity of the outlined limitations. (R. at 1155.) With respect to the issue of leg elevation, the ALJ stated that Dr. Al-Assaad's statements were "inconsistent with the record as a whole." (R. at 1154.) Further, the ALJ noted that Plaintiff "has been able to sit, stand, and walk and no other treating or examining medical provider has supported a need for leg elevation." (*Id.*) Additionally, the ALJ explained that "in terms of the limits on elevating ones legs, while [Plaintiff] testified to edema, the record does not support lower extremity edema. (*Id.*) In fact, the record shows no chest pain, palpitations, orthopnea, or edema (Exhibit 19F/21)." (*Id.*)

Substantial evidence supports the ALJ's conclusion regarding the medical evidence relating to Plaintiff's need for leg elevation during the insured period. Plaintiff's argument that the record "consistently documents" his problems with edema and swelling simply is not accurate. While there are a few mentions of edema in certain treatment records, many of the

records cited by Plaintiff do not involve lower extremity edema.  For example, on November 8, 2013, Plaintiff's chest x-ray noted pulmonary edema.  (R. at 427.)   Further, in March 2017, Plaintiff's treatment records indicate some edema in his cheek after he "was drinking with friends and somehow ran into a wall face first."  (R. at 1541, 1818.)

To be fair, a very few treatment records do indicate lower extremity edema, but they are few and far between and not indicative of a consistent issue.   Specifically, on November 6, 2013, a CT of Plaintiff's lower extremity showed edema and heterogeneity to the right calf muscles.  (R. at 400.)  However, the scan also revealed that "[t]here is not significant occlusive change in the vessels of the left lower extremity…."  (*Id.*)  Further, on November 11, 2014, Plaintiff was treated for "right foot pain and swelling" and mild edema was noted in his left foot. (R. at 908.)  Additionally, on August 4, 2016, Plaintiff exhibited edema in his left lower extremity which he described as chronic.  (R. at 1501.)  However, he was "able to ambulate to exam room" with a "steady gait."  (*Id.*)  These few instances are significantly outweighed by the numerous documented instances where Plaintiff exhibited no edema in his extremities and normal range of motion.  (*See, e.g.*, R. at 880, 893, 1395, 1407, 1420, 1426, 1464, 1517, 1543, 1581, 1585, 1623, 1626, 1647, 1681, 1683, 1684, 1698, 1712, 1717, 1734, 1757, 1787, 1819, 1830, and 1851.)   Accordingly, substantial evidence supports the ALJ's decision not to include a limitation relating to leg elevation in the RFC.

## 2.  Mental Health Limitations

Plaintiff also asserts that the ALJ erred in evaluating his mental health limitations resulting in a deficient RFC that fails to adequately address those limitations.[2]

In evaluating a claimant's case, the ALJ must consider all medical opinions that he receives. 20 C.F.R. § 416.927(c). Medical opinions include any "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Here, Dr. Meyer is a nontreating source. *See Smith v. Comm'r of Social Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("A 'nontreating source' (but examining source) has examined the [plaintiff] 'but does not have, or did not have, an ongoing treatment relationship with' her.") (citing 20 C.F.R. § 404.1502.)  Although an examining source's opinion generally is entitled to greater weight than the opinion of a non-examining source, 20 C.F.R. § 416.927(c)(1), an ALJ may reject an opinion if it is inconsistent with the record evidence. 20 C.F.R. § 416.927(c)(4); *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010).   Drs. Waggoner and

---

[2] Plaintiff also suggests in passing in an undeveloped argument that the ALJ's reasoning was supported only by his lay lay opinion.  (ECF No. 10, at p. 11.)  The Undersigned declines to consider this argument.  *See Dixon v. Comm'r of Soc. Sec.*, No. 2:17-CV-778, 2018 WL 3968396, at *1 (S.D. Ohio Aug. 20, 2018*), report and recommendation adopted sub nom. Dixon v. Juhola*, No. 2:17-CV-778, 2018 WL 5650008 (S.D. Ohio Oct. 31, 2018) (citing *McPherson v. Kelsey*, 125 F.3d 989, 996-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (internal quotation marks and citations omitted)).  Moreover, as discussed, the Undersigned finds no error with the ALJ's consideration of the opinion evidence.

Voyten, on the other hand, are state agency consultants. An ALJ "must explain in the decision the weight given the opinions of a State Agency medical ... consultant[,]" 20 C.F.R. § 404.2527(e)(2)(ii), but need not give "an exhaustive factor-by-factor analysis" of his decision. *Cf. Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citations omitted).

**a. Dr. Meyer**

Turning first to Dr. Meyer, the ALJ considered his opinion regarding Plaintiff's intellectual functioning and impairments, and assigned it "significant, but not adoptive or determinative weight[,]" reasoning as follows:

> The undersigned has read and considered the opinion of Dr. Meyer, evidenced at Exhibit 6F. Dr. Meyer opined the claimant had a GAF score of 57, denoting no more than moderate mental health deficits. He further assessed the claimant had the capacity to understand, remember, and carry out simple and some moderately complex instructions; would be expected to be able to perform in a setting without strict production requirements for work within any physical conditions with consideration assistance at times of learning and performing new tasks; would be expected to be able to interact appropriately within a work setting that has low social requirements with occasional contact with coworkers and supervisors; and would be expected to be able to perform in a low stress work setting for work within any physical conditions and with assistance available at times of change in routine. The undersigned affords some weight to the GAF score. While a GAF score is not a determinative measure of disability, is relevant only on the date and time at which it was assessed, and takes into consideration other extraneous factors not considered when determining disability, such as financial stressors, here the GAF score is generally consistent with the evidentiary record documenting no more than moderate mental health limitations. The record supports the claimant has not require[d] more than conservative medication management for his alleged mental health conditions provided by his primary care physician. He has never decompensated and required inpatient hospitalization of extended duration and the claimant has never required any counseling sessions with licensed psychiatrists or counselors. While the GAF score is given some weight, the undersigned affords greater weight to the functional limitations provided by Dr. Meyer. Dr. Meyer was a consultative examiner and able to observe the claimant in person. While only on one occasion, he is familiar with evaluating individuals and assessing mental limits. The undersigned affords little weight to any references made to the claimant's physical functional capacity, as the undersigned finds Dr. Meyer is not a specialist in the area of physical health functioning

and his expertise is analyzing and understanding mental health issues and functional abilities as a result of mental health diagnoses and symptoms. The undersigned finds the limitation to more simple instructions with oral/hands on assistance persuasive. In doing so, the undersigned finds the ability to perform moderately complex instructions less persuasive. The undersigned finds the record supports breakthrough symptoms in concentration, due to reports of pain, as well as breakthrough symptoms of irritability, and racing thoughts affecting this area of functioning. While the undersigned has not adopted the limitation verbatim, the undersigned finds providing oral/demonstrated instructions coupled with limits to simple, routine, repetitive tasks, in a setting with few changes, provides for a restricted work setting. The undersigned finds the severity of limitation as noted by Dr. Meyer is not required as the record does not support consistent confusion and in fact was "negative" for confusion (Exhibit 36F/10). The claimant remained independent in his money management, was permitted to continue driving, was not assessed a safety hazard, and could perform activities, such as paying bills (Exhibit 28F). The undersigned finds the limitation on production requirements is consistent with the claimant's reports of concentration issues, in part due to pain, as well as in part due to his reported memory loss issues related to vascular dementia and due to his reports of breakthrough moodiness and anxiety. The undersigned finds the occasional contact with others/social limits persuasive, given the claimant's breakthrough symptoms despite ongoing medication use. However, the undersigned finds due to moodiness and reports of irritability, additional limits on tandem tasks and customer service responsibilities would be supported. The undersigned finds the adaptive limits such as those in the suggested low stress setting persuasive. The undersigned finds limits on the changes in the work setting are supported by the claimant's limited coping skills and his testimony that he felt due to ongoing mental symptoms he would need to participate in additional mental therapy. Therefore, the undersigned finds Dr. Meyer's opinion overall persuasive and affords it significant, but not adoptive or determinative weight.

(R. at 1157-58.)

Plaintiff contends that the limitation that "instructions should be given orally or by demonstration" does not adequately address his need for assistance with changes and with learning, performing and in completing tasks as Dr. Meyer opined.  Further, Plaintiff asserts that the ALJ failed to explain his reasons for omitting any additional limitations.  Finally, Plaintiff argues that, because the VE testified that the need for oral and hands-on assistance up to a

frequent basis would be a work-preclusive accommodation, the ALJ's decision to omit these limitations is "problematic." (ECF No. 10 at p. 10.) Plaintiff's position is not well-taken.

First, the ALJ is not required to adopt all of the limitations recommended by a source simply because that source's opinion has been accorded significant weight. *See Earley v. Comm'r of Soc. Sec.,* No. 2:19-CV-53, 2020 WL 1080417, at *3 (S.D. Ohio Mar. 6, 2020); *Price v. Comm'r of Soc. Sec.*, No. 2:18-CV-128, 2019 WL 396415, at *2 (S.D. Ohio Jan. 31, 2019); *see also Matejka v. Comm'r of Soc. Sec.*, No. 1:13-cv-1933, 2014 WL 3197437, at *13 (N.D. Ohio July 8, 2014) ("Even when an ALJ accords 'significant weight' to a medical opinion, the ALJ is not required to adopt every opinion expressed by the medical expert."). Further, although "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). Significantly, they are not required to give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016).

Further, substantial evidence supports the ALJ's detailed evaluation of Dr. Meyer's opinion and his conclusion to give it significant, but not adoptive or determinative, weight. For example, the ALJ's finding that Plaintiff's confusion was not supported is consistent with the record. (R. at 1051, 1463, 1725, 1959, 1987, 2041.) He properly discounted the opinion on this basis. *See Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 425-26 (6th Cir. 2014) (holding opinion may be discounted if it is inconsistent with other evidence of record). Further, the ALJ correctly

noted that, despite reports of significant stress, depression, and anxiety, Plaintiff received only

conservative treatment with medication with no evidence of formal treatment with mental health

professionals on a regular basis.  (*See e.g.,* R. at 973, 1037, 1039, 1193.)  These factors provide a

proper basis to discount an opinion.  *See e.g., Lester v. Soc. Sec. Admin*., 596 F. App'x 387, 389

(6th Cir.2015) (finding the ALJ reasonably discounted a doctor's proposed limitations because,

among other things, the claimant was receiving conservative treatment); *McKenzie v. Comm'r of

Soc. Sec*., 215 F.3d 1327, No. 99–3400, 2000 WL 687680, at *4 (6th Cir. May 19, 2000)

(unpublished opinion) ("Plaintiff's complaints of disabling pain are undermined by his non

aggressive treatment."); *see also* 20 C.F.R. § 404.1527(c)(2) ("We will look at the treatment the

source has provided. . . .").  Additionally, the ALJ reasonably considered that Plaintiff had

reported his ability to manage his money, perform household chores, shop, and prepare meals

when deciding the weight to assign to Dr. Meyer's opinion. (R. at 802.)  *See Swanson v.

Berryhill*, No. 6:17-183-DCR, 2018 WL 813579, at *4 (E.D. Ky. Feb. 9, 2018) (finding that the

plaintiff's statements about his daily activities "undermine his assertions that he is disabled").  In

sum, substantial evidence supports the ALJ's well-explained reasons for discounting portions of

Dr. Meyer's opinions.  *Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 690 (6th Cir. 2007)

("The ALJ did not summarily dismiss [the doctor's] opinion. Rather, the ALJ detailed at

substantial length why he found it lacking compared with the other evidence. This is all that we

require when reviewing an administrative law judge's decision for compliance with 20 C.F.R. §

404.1527(d)(2)'s reasons-giving requirement.").

Plaintiff insists that the RFC should have included additional limitations identified by Dr. Meyer. (ECF No. 10 at 9.) While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination as it relates to Dr. Meyer's proposed limitations and this explanation enjoys substantial support in the record. *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.").

**b.  Drs. Waggoner and Voyten**

Plaintiff also argues that the ALJ erred in failing to account for his need for only superficial contact with co-workers and supervisors as opined by Drs. Waggoner and Voyten, the State agency consultants.  The ALJ addressed their opinions in this way:

> The undersigned affords some weight to the opinion of the State Agency consultants' mental assessments evidenced at Exhibits 1A, 2A, 3A, and 4A. The consultants opined the claimant retained the ability to perform simple, 1-2 step tasks; could attend to tasks in an environment that does not contain frequent interruptions and does not require prioritizing of tasks; could interact with coworkers and supervisors on a superficial level, but contact with the general public should be kept to a limited basis; and could perform a job where changes could be introduced gradually and could be explained. The undersigned finds the record supports limitations in understanding, applying, and remembering information, given breakthrough symptoms, including moodiness, intermittent worthlessness, and anxiety. However, the undersigned finds specific limits on 1-2 step tasks were not needed as the claimant's reported activities of daily living, such as managing his money, performing household chores, going shopping, and preparing meals, supports he was able to perform greater step tasks/activities. The undersigned finds the limitations in attention/concentration/persistence/pace, persuasive. While the undersigned has not adopted the limitation verbatim, the undersigned finds limiting

the claimant to simple, routine, repetitive tasks with only simple decisions, eliminates the need for task prioritization. The undersigned finds limitations to tasks without customer service responsibilities and no tandem tasks and to those with only occasional interaction, eliminates any "frequent" interruption. However, due to reports of memory issues, the undersigned finds the record supports additional limits on pace and production quotas. The undersigned finds limitation in social functioning partially persuasive. The undersigned has not adopted the limitation verbatim as it has been determined that "superficial" is not a vocationally relevant term. However, this portion of the opinion was addressed by limiting the claimant to occasional interaction with others with no tandem task and no customer service responsibilities. The undersigned finds the claimant's reports of breakthrough symptoms of irritability and anxiety, as well as reports of moodiness, despite taking medications supports the need for social limits. The undersigned finds the record does not objectively support any preclusion on public contact, as the claimant remained able to attend doctors' appointments independently, go shopping, attend church, and use public transportation, as well as travel on vacation. Further, he took his daughter trick or treating in his local neighborhood. The undersigned finds the need for adaptive limits persuasive, given the claimant's limited coping skills and testimony that he felt he needed counseling due to ongoing breakthrough mental symptoms, such as moodiness. The undersigned has not adopted the limits verbatim, but finds reports of memory issues supports a need to have instructions given orally or by demonstration, as well as limiting the amount of changes in the work setting. Additionally, while the undersigned did not adopt the language of the consultants' regarding changes being gradually introduced or explained, given the limitations of the hypothetical as a whole, changes in the work setting would be limited, instructions would continued to be provided orally or by demonstration, and the claimant would not be performing tasks that were more than simple, routine, and repetitive in nature. Therefore, overall, the undersigned has not adopted the consultants' mental opinion verbatim, but does find the assessed limitations in each area of functioning generally persuasive. However, the undersigned has found the record supports additional mental limits, particularly in understanding/remembering/applying information, social functioning, and adaptation, due to the claimant's combination of reported moodiness and memory loss. Thus, overall the undersigned provides the consultants' mental opinion some weight.

Plaintiff contends that the ALJ's limitation to occasional interaction with others accounted only for the frequency of contact but did not address the quality of the contact. The Commissioner argues that this was not the full extent of the ALJ's accommodations to Plaintiff's

social functioning limitations. Rather, the Commissioner points out, the ALJ also restricted Plaintiff to no tandem tasks and no customer service responsibilities.

The Court agrees that the limitation to no tandem tasks is a qualitative limitation on social interaction. As such, this limitation adequately addressed the opinion of Drs. Waggoner and Voyten that Plaintiff be limited to superficial interaction with others. *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020), *report and recommendation adopted*, No. 3:19-CV-1243, 2020 WL 2839654 (N.D. Ohio June 1, 2020); *see also Collins v. Comm'r of Soc. Sec.*, No. 3:17 CV 2059, 2018 WL 7079486, at *6 (N.D. Ohio Dec. 7, 2018) ."), *report and recommendation adopted by* 2019 WL 1409535. ("Contrary to Plaintiff's argument, the ALJ restricted Plaintiff from 'team or tandem tasks' (Tr. 15), which logically require more than superficial interpersonal contact. This is a restriction on the quality of interpersonal contact.)

Finally, substantial evidence also supports the ALJ's analysis of these State Agency consultants' opinions and his decision to afford them only some weight. For example, the record supports the ALJ's explanation that Plaintiff was not precluded from all public contact because he regularly attended church (R. at 62, 306, 580); was able to shop (R. at 305, 802); could use public transportation (R. at 306); and took his daughter trick or treating. (R. at 908.) Additionally, the ALJ reasonably considered that Plaintiff had reported his ability to manage his money, perform household chores, shop, and prepare meals when deciding the weight to assign to these opinions. (R. at 802.) *See Swanson,* 2018 WL 813579, at *4.

25

Again, although Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination as it relates to the State Agency psychologists' proposed limitations and this explanation enjoys substantial support in the record.

For all of these reasons, the Undersigned finds that substantial evidence supports both the ALJ's assessment of the mental health evaluations at issue and his formulation of the RFC based on those assessments.  Accordingly, the Undersigned **RECOMMENDS** that this contention of error be **OVERRULED**.

### B.  Dr. Kataki's Opinion

Plaintiff also argues that the ALJ failed to include any discussion of Dr. Kataki's medical opinion or findings in his decision, thereby failing to satisfy his duty to accord weight or allow for subsequent review.  Plaintiff's reading of the ALJ's opinion again is not accurate.  First, the ALJ discussed Dr. Kataki's medical findings in some detail.  These findings were identified by the ALJ as Exhibits 24F (R. at 1149-1140, *see also* Ex. 24F, R. at 1013 – 1020) and 25F (R. at 1150, *see also* Ex. 25F, R. at 1021-1033.)  The ALJ discussed Dr. Kataki's findings as follows:

> In addition to anxiety and depression, the claimant endorsed some memory deficits following his remote 1997 stroke. It should be noted since the time of his stroke, the claimant had engaged in substantial gainful activity; however, his memory, since the time of his heart attack, has been evaluated. During the time after his stroke, the claimant endorsed he was independent in all the instrumental activities of daily living (Exhibit 24F/l). Prior to 2016, the record noted the claimant has some short term memory deficits (Exhibit 6F). However, his memory remained intact and his cognition was normal (Exhibit l 7F/19, 21). In March 2016, his wife voiced a concern over some memory loss and he underwent a memory evaluation (Exhibits 24F; 28F). The claimant reported he has some memory loss and mood changes (Exhibit 28F/6-7). While reporting the memory loss, the claimant endorsed he was managing his own medications, remained independent for understanding and

reading, had no difficulty managing the TV remote or dialing the telephone, endorsed some difficulty performing household tasks, indicated he had some difficulty recalling and remembering recent events or short lists of items, reportedly relied upon making lists, and was capable of independently caring for his own personal care (Exhibit 28F/6). In March 2016, the claimant reported some impaired thinking (Exhibit 24F). He reported difficulty finding some words (Exhibit 24F/l). The claimant reported he has some difficulty recalling events and grasping situations or explanations (Exhibit 24F/2). He reported no hallucinations or delusions, no aggressiveness or personality changes, but did indicate since his memory deficits emerged, he limited his driving to local areas only (Exhibit 24F/2). Radiographic imaging of the brain showed some evidence of ischemia, but no evidence of acute trauma involving the brain (Exhibit 24F/2). During testing, the claimant was noted to be fully oriented to time and place (Exhibit 24F/6). He was able to register three words for short term memory testing and recall all of them after a brief delay; however, he could not perform serial 7s (Exhibit 24F/6). He was noted to have poor word fluency, impaired memory, impaired modified trails and problem solving, and some cognitive deficits; however, testing was unable to correlate whether the deficits worsened since his myocardial infarction (Exhibit 24F/6). The claimant showed intact orientation and delayed recall, as well as reading comprehension, writing skills, and abstract thinking (Exhibit 24F/7). However, he showed some impaired ability to perform calculations, impaired visual spatial skills, and impaired executive functioning with memory loss (Exhibit 24F/7).

In April 2016, brain imagining showed no acute intracranial abnormality but multifocal areas of low attenuation in the left cerebral hemisphere, possibly related to infarction (Exhibit 25F/l l,14-15). There was a small infarct in the anterior right basal ganglia, but no significant interval change in the remainder of the examination, compared to the prior study (Exhibit 25F/11, 14-15). The examiner assessed that the claimant's objective testing showed his cognitive impairment showed the criteria for dementia; however, this dementia was noted to be *mild in severity* (Exhibit 25F/4, 11). It should be noted despite his noted memory deficit, the claimant continues to engage in relatively normal activities of daily living, endorsed he was able to manage his medications, manage his finances, go shopping, and drive, just limiting himself to local areas.

(R. at 1149-1150.)

The ALJ also found Dr. Kataki's opinion "somewhat persuasive and gave it "overall some weight." (R. at 1155.) The ALJ identified Dr. Kataki's opinion as Exhibit 34F/182. (*Id*., *see also* Exhibit 34 at R. at 1882-1887.) The ALJ addressed this opinion as follows:

27

The undersigned has read and considered the opinion evidenced at Exhibit 34F/182. The claimant's physician opined the claimant should restrict freeway driving and driving in unfamiliar places, as well as nighttime driving, but could continue to drive without safety concerns. The physician also opined the claimant should be supervised driving once per month and if safety issues arise, she should take the state driving exam. The undersigned finds opinion regarding the general ability to drive generally persuasive. While the claimant reported he did not have a valid driver's license, he reported that he was able to drive (Exhibit 17F). The limitations assessed on unfamiliar places, nighttime driving, and freeway driving were due to reported memory issues, the undersigned finds such limits partially persuasive, as the claimant was diagnosed with vascular dementia in *mild* symptom severity. However, the undersigned finds the record did not document routine confusion. In fact, the claimant was able to watch television, operate a phone and television remote, and reported no confusion during follow up appointment sessions. Thus, collectively, the undersigned finds the opinions somewhat persuasive and gives them overall some weight.

(R. at 1155.)

Although Plaintiff is correct that the ALJ did not identify Dr. Kataki by name when addressing her medical opinion regarding his limitations, it is clear that he discussed her medical opinion and findings at some length in his decision. In doing so, he satisfied both his duty to accord the opinion weight and to allow for subsequent review. Plaintiff's contention to the contrary lacks merit and Plaintiff has raised no other issue with respect to Dr. Kataki's opinion. Accordingly, the Undersigned **RECOMMENDS** that this contention of error be **OVERRULED**.

## VII.    CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:     July 27, 2020                          /s/ *Elizabeth A. Preston Deavers*
                                                  Elizabeth A. Preston Deavers
                                                  Chief United States Magistrate Judge

29